UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

02 NOV 15 AM 10: 27

U.S. ⸱ ⸱ ⸱ T
D. ⸱ ⸱ ⸱ ⸱BAMA

| | |
|---|---|
| AUNDREA McCRARY and<br>BRENDA BUCHANAN, | )<br>) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| USA HEALTHCARE - VA, LLC, | ) |
| | ) |
| **Defendant.** | ) |

Civil Action No. CV-01-S-0262-NE

**ENTERED**

NOV 15 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

This action was commenced by a single plaintiff, Aundrea McCrary, who filed her complaint on January 26, 2001. That pleading was never served, however. Rather, on March 29, 2001, an amended complaint was filed, adding claims on behalf of three additional plaintiffs: Danielle Hendrix, Angie Anderson, and Brenda Buchanan. Plaintiffs subsequently were allowed to file a second amended complaint, to reflect that the defendant's correct name is "USA Healthcare-VA, L.L.C."[1] On February 8, 2002, this court entered an order dismissing with prejudice all claims of plaintiffs Danielle Hendrix and Angie Anderson, in accordance with the parties' joint stipulation of dismissal.[2] This case thus has come down to the claims of plaintiffs Aundrea McCrary ("McCrary") and Brenda Buchanan ("Buchanan"), which are based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as well as 42 U.S.C. § 1981. McCrary, who is an African American female, alleges that defendant discriminated against her on the basis of her race when it failed to rehire her, while Buchanan, who is a Caucasian female, alleges that defendant

---

[1] See doc. nos. 1 (original complaint), 2 (amended complaint), 4 (answer to amended complaint), 5 (motion to amend complaint to correctly name defendant), 7 (order granting motion to amend), and 8 (second amended complaint). (References hereto to "doc. no. ___" are to the numbers assigned pleadings stamped by the Clerk as "filed.")

[2] See doc. nos. 28 (stipulation of dismissal) and 29 (order dismissing fewer than all claims).



discriminated against her by subjecting her to a hostile work environment, unfair discipline, retaliation, and termination of employment.

McCrary and Buchanan also alleged claims based upon the state law tort of outrage, but abandoned such claims at the summary judgment stage by failing to respond to defendant's arguments. Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.,* *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).[3]

---

[3] *Cf., e.g., Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are

The case presently is before the court on defendant's motion for summary judgment. Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted.

---

considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to addressed issue for failure of party to argue it in its brief on appeal).

## I. SUMMARY OF FACTS

The two remaining plaintiffs largely rely upon mutually-exclusive facts and, thus, the facts relevant to each plaintiff's claims will be summarized in turn.

**A.      Aundrea McCrary**

Defendant assumed control of the Floyd E. "Tut" Fann State Veteran's Home ("Tut Fann"), a nursing home for veterans located in Huntsville, Alabama, during April of 1999.[4]  McCrary, an African American female, then was employed at Tut Fann as a Licensed Practical Nurse ("LPN"). She had been so employed since August of 1997.[5]  When defendant assumed control of the nursing home, the company required that all current employees apply for re-employment, if they desired to retain their jobs.[6]

**1.      Defendant's drug screening process**

All applicants were required to submit to a mandatory drug screening analysis.[7]  The screening process required applicants to sign a form authorizing defendant to test bodily fluids for the presence of controlled substances.[8]  The form allowed an applicant to disclose any medications he or she had taken that might affect test results.[9]  The applicant then provided a urine sample.[10]  An employee of the defendant stood outside a toilet stall while the applicant filled a container with his or her urine.[11]  Following collection, defendant's employee dipped a drug testing strip into the urine

---

[4]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 97-98, 101-02.

[5]*Id.* at 82-83, 98.

[6]*Id.* at 103.

[7]*Id.* at 107-08.

[8]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 114.

[9]*Id.* at 114-15.

[10]*Id.* at 115.

[11]*Id.*

sample.[12] If the color of the card indicated the presence of some controlled substance, the applicant was asked whether he or she had ingested any medications, dietary supplements, diet pills, herbal tea, or other substance that might have produced the positive result.[13] If an applicant challenged the drug test, the urine sample was sent to an independent drug testing laboratory for intensive analysis. A medical review officer at the independent facility performed other tests to confirm or negate the initial positive result.[14]

### 2.    McCrary failed the drug test and was not hired by defendant

McCrary applied for re-employment with defendant on Friday, April 30, 1999.[15] She consented to the required drug test,[16] and submitted a urine sample on the same day.[17] However, she surreptitiously substituted another person's urine for her own urine while inside the toilet stall.[18] McCrary claims that she did so because she had ingested her mother's prescription medication for relief of back pain, and she was afraid the medication would cause her own urine to test positive.[19] Unfortunately for McCrary, the urine she submitted for analysis was not particularly helpful, as it tested positive for the presence of marijuana.[20] McCrary nevertheless maintained her subterfuge, and defendant sent the switched sample to an independent laboratory for further testing that would confirm or negate the initial result.[21]

---

[12]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 115.

[13]*Id.* at 115-16.

[14]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 116.

[15]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 105-07.

[16]*Id.* at 110-11.

[17]*Id.* at 111-13.

[18]*Id.* at 127.

[19]*Id.* at 131-32.

[20]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 114-15.

[21]*Id.* at 127-28.

The following Monday, McCrary telephoned Elizabeth Black, who then was the Assistant Director of Nursing at Tut Fann, to inquire about the result of the laboratory analysis.[22] Black then did not know the results.[23] In a later conversation with Black, McCrary asked whether she could be re-screened, explaining for the first time that she surreptitiously had submitted another person's urine as her own. In McCrary's opinion, she was *entitled* to a second screening, because *her own urine* had not actually failed the drug test.[24]

On Tuesday, May 4, 1999, McCrary returned to Tut Fann to pick up her paycheck.[25] While there, she saw Black in the hallway, and again questioned her about the drug test.[26] Black told McCrary that she and Cathy Sliger, who then was the director of nursing, would speak to McCrary in a nearby office.[27] Sliger and Black told McCrary that laboratory analysis had confirmed the presence of marijuana in the urine sample submitted by McCrary.[28] McCrary again asked to be allowed to submit to a second drug screen.[29] Sliger replied that she already had discussed that with defendant's corporate office, and McCrary's request had been denied.[30] In McCrary's words, the "Home office said that if I lied once that I would lie again, and that they would not rescreen me."[31] Sliger and Black thus informed McCrary that defendant would not hire her.[32] McCrary has not

---

[22]*Id.* at 122-23; Defendant's brief in support of summary judgment, at 5.

[23]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 122-23.

[24]*Id.* at 126-28. McCrary does not recall exactly what day this conversation took place, but indicates that it must have occurred either on Monday, May 3, 1999, or Tuesday, May 4, 1999.

[25]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 123.

[26]*Id.* at 124.

[27]*Id.* at 124-25.

[28]*Id.* at 125.

[29]*Id.* at 125-26.

[30]*Id.*

[31]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 126.

[32]*Id.* at 129.

6

identified the actual decisionmaker, or who was hired in her place.[33]

### 3.    A Caucasian co-worker failed the drug test, but eventually was hired

Another applicant, Kelly Manley, a Caucasian female, also tested positive during defendant's pre-hiring drug screen.[34]   Manley had worked as a Certified Nursing Assistant ("CNA") prior to defendant's takeover of the Tut Fann nursing home.[35]   Like all other employees at the facility, Manley was required to apply for re-employment with defendant, and submit to a drug test.[36]   Manley presumably submitted her own urine (there is no evidence that she did not), but it tested positive for benzodiazepines.[37]   Defendant later learned that Manley had failed to disclose her ingestion of a medication prescribed for her mother.[38]   After failing the drug test, Manley took her mother's prescription bottle to management officials, in an attempt to explain the positive result of her drug test.[39]   Defendant nonetheless refused to hire her.[40]

Manley's supervisor prior to defendant's takeover had been Nadine Owens, an African American female.[41]   When Owens learned that Manley had not been hired, Owens wrote defendant's corporate headquarters and argued that Manley should be hired.[42]   Manley re-applied in June of 1999, and was hired.[43]

### 4.    McCrary's allegations of racial discrimination in hiring

---

[33]*Id.* at 130.

[34]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 185-86, 191.

[35]*Id.* at 184.

[36]*Id.* at 100.

[37]*Id.* at 185-86.   Benzodiazepines are a family of drugs which include Valium, Ativan, Serax, and others. *Id.*

[38]*Id.* at 198-99.

[39]*Id.* at 194-95.

[40]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 205-06.

[41]Defendant's evidentiary submissions, Exhibit 4 (Owens declaration) ¶ 3.

[42]*Id.* at ¶ 6.

[43]*Id.* at ¶ 8.  Plaintiffs' evidentiary submissions, Tab 11 (Manley application (dated June 14, 1999)).

After McCrary was not hired by defendant in May of 1999, she spoke with Sandra Houston, who worked in the human resources department at Tut Fann.[44] McCrary told Houston that she intended to re-apply and took an application with her.[45] McCrary completed the application and gave it to the receptionist at the front desk.[46] McCrary also continued to inquire about vacant positions at Tut Fann.[47] McCrary was told by several Tut Fann employees that vacant positions were available.[48]

Defendant's standard hiring process for LPNs was as follows. The application first was evaluated by the staff development nurse.[49] If deemed acceptable, the application was forwarded to the director of nursing.[50] In ordinary hiring situations, the director of nursing made the ultimate hiring decision.[51] An applicant who failed the drug test, however, could not be hired without the consent of the facility administrator.[52] During the period covering McCrary's second application for employment by defendant, co-plaintiff Brenda Buchanan was staff development nurse[53] and Marisa Keenum was director of nursing.[54] The facility administrator was Linda Withers until November of 1999, when she was replaced by Mattie Banks.[55]

---

[44] Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 150.

[45] *Id.* at 151.

[46] *Id.* at 160.

[47] *Id.* at 151.

[48] *Id.* at 154-55.

[49] Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 60-63.

[50] *Id.*

[51] *Id.* at 62.

[52] Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 97-98.

[53] Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 48.

[54] *Id.* at 48-49.  Keenum took over as director of nursing on July 16, 1999.  Defendant's evidentiary submissions, Exhibit 3 (Keenum declaration) ¶ 1.

[55] Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 48.; Defendant's evidentiary submissions, Exhibit 1 (Banks declaration) ¶ 1.

When McCrary did not receive a response to her second application for employment, she telephoned Keenum and Buchanan.[56]  Keenum told McCrary that her previous failure of the drug test prevented her hire.[57]  However, Buchanan told McCrary of a "rumor" that Keenum actually had thrown McCrary's application in the trash.[58]  Buchanan testified that Keenum instructed her to start hiring Caucasian people at Tut Fann, because "the intelligent [*sic*] level was very low and the majority of all of our employees were black."[59]  Keenum ordered Buchanan to submit pictures of applicants.[60]  Keenum also asked Buchanan, "is that the only kind of person [African American] that ever comes in here and applies for a job?"[61]

## B.   Brenda Buchanan

Plaintiff Brenda Buchanan, a Caucasian female, claims that defendant subjected her to racially-disparate treatment, a racially-hostile work environment, and retaliation, all because she was involved in an inter-racial relationship, and had other associations with African Americans.[62]

Buchanan was hired as an employee at the Tut Fann nursing home on May 1, 1999, following defendant's assumption of control over that facility.  She was terminated seven months later, on December 1, 1999,[63] by then-acting facility administrator Mattie Banks.  During her employment with defendant, Buchanan dated Michael Irvin, an African American male.[64]

---

[56]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 163-64.

[57]*Id.* at 166.

[58]*Id.* at 170.

[59]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 68.

[60]*Id.* at 72-73.

[61]*Id.* at 73.

[62]Amended complaint.

[63]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 235-36.

[64]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 69-70.

Buchanan worked at Tut Fann as the facility's staff development nurse.[65]   Her duties consisted mainly of pre-screening nursing applicants and providing routine training to the facility staff, as well as operating the nurse aide training program.[66]   The staff development nurse also performed various other duties, as the situation required.[67]

### 1.   Race-based statements by defendant's employees

Marisa Keenum, director of nursing, Matt Comstock,[68] a maintenance supervisor, and Mattie Banks, facility administrator, made numerous comments during Buchanan's employment which she found racially-offensive.  Buchanan complains of the following incidents, which are documented in the parties' evidentiary submissions.[69]

(1)     Keenum told an African American CNA (Carmen Miller) not to complete her paperwork behind the nurse's desk, saying that "I am sick and tired of seeing you people behind this desk all the time."[70]  Buchanan then explained in her deposition: "Carmen said, what do you mean by you people.  She [Keenum] said you know exactly what I mean.  You get out from behind that desk and you go down the hall and you find something to do.  She did not say anything to the other CNA who was Caucasian [Ann Glassbyrd]."[71]

(2)     Keenum told Buchanan to start hiring Caucasian employees "so we could get some intelligence in the building, because the intelligent [sic] level was very low and the majority of all of our employees were black."[72]  Matt Comstock, a maintenance supervisor, also made similar statements on numerous occasions.[73]

---

[65]*Id.* at 46.

[66]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 59-63.

[67]*Id.* at 240-41.

[68]Remarkably, Comstock is a defendant in another civil matter pending before this court, where he is similarly-accused of uttering the racial epithet "nigger" in the workplace; this time at the job that he held immediately prior to his employment with defendant. *Jones v. Azar, Inc.*, No. CV-01-S-0593-NE (filed March 7, 2001).

[69]Plaintiffs' brief also mentions a few other discriminatory remarks and acts, but the court was unable to find Plaintiffs' factual basis for these allegations in the evidentiary submissions, either because the citing party did not provide a citation to the record following the allegation, or the citation did not contain the purportedly cited information.

[70]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 67.

[71]*Id.*

[72]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 68.

[73]*Id.* at 78.

(3)    Keenum told Buchanan that if African American co-employee Cynthia Jones were on Keenum's property, Keenum would show Jones's "black ass what an ass beating was all about."[74]

(4)    Keenum and Comstock told Buchanan that they wanted photographs of applicants submitted with all applications for employment.[75]

(5)    While discussing the facility barbeque, Keenum stated that "we had to have a lot of chicken and watermelon to satisfy all the black people working [at Tut Fann]."[76] Comstock then replied, "yeah, because niggers really like that kind of food."[77]

(6)    Comstock used the epithet "nigger" on a regular basis, often when the employees were talking during breaks.[78]

(7)    Comstock described an African American housekeeping employee (Bertha Ferrier) as "stupid and dumb."[79]

(8)    During the summer of 1999, Keenum saw Michael Irvin (Buchanan's boyfriend) pick her up after work.[80]  The next day Keenum asked Buchanan who the man was.[81] Buchanan replied that he was her boyfriend.[82]  Keenum remarked that she was surprised Buchanan would date a black man.[83]

(9)    Comstock asked Buchanan if the applicants for openings in the security department were black or white.[84]

(10)    African American employee Martin Green stated that Keenum treated black employees worse than white employees, and he heard Keenum comment:  "from the town I was raised in, we would take them out in the field."[85]

(11)    African American employees Veda McRoy and Martin Green both stated that Mattie

---

[74]*Id.* at 72.

[75]*Id.* at 73, 94-95.

[76]*Id.* at 75.

[77]*Id.* at 77-78.

[78]*Id.* at 78-79, 88.

[79]*Id.* at 78.

[80]*Id.* at 69-70; Plaintiffs' brief opposing summary judgment, at 8

[81]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 69-70.

[82]*Id.*

[83]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 69-70.

[84]*Id.* at 93-94.

[85]Plaintiffs' evidentiary submissions, Tab 28 (Green affidavit) ¶ 4.

Banks told African American employees at a staff meeting, "if you all don't like what I'm saying then you can go start flipping patties at the local fast food place."[86] Buchanan was the only Caucasian employee present at the staff meeting.[87]

(12)    Green and McRoy both heard that an African American CNA overheard Keenum say "nigger" in the bathroom.[88]

(13)    Green told Buchanan that Keenum said she was "tired of the black asses and their not doing anything."[89]

(14)    Green told Buchanan that Banks frequently referred to African American employees as "you people."[90]

(15)    After Buchanan hired Angela Sims, an African American, to work in the staffing department, Keenum told Buchanan that "she didn't want any more black management people on the team."[91]

## 2.    Buchanan's workplace discipline and subsequent discharge

Buchanan did not receive any written reprimands until September 13, 1999.[92]    She subsequently received three more written reprimands (four in total) and was terminated on December 1, 1999.[93]    Buchanan believes that she received this string of reprimands because "Keenum was setting her up to be terminated," following Keenum's discovery that Buchanan was involved in an interracial relationship with an African American male.[94]

Defendant referred to these reprimands as "disciplinary action[s]."[95] All four of the written reprimands issued to Buchanan were documented on the same "disciplinary action" form, which

---

[86]*Id.* at ¶ 6; Plaintiffs' evidentiary submissions, Tab 29 (McRoy declaration) ¶ 6.

[87]Plaintiffs' evidentiary submissions, Tab 28 (Green affidavit) ¶ 6.

[88]*Id.* at ¶ 7; Plaintiffs' evidentiary submissions, Tab 29 (McRoy declaration) ¶ 4.

[89]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 65.

[90]*Id.*

[91]*Id.* at 82.

[92]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 236.

[93]*Id.*; Plaintiffs' evidentiary submissions, Tabs 18-21 (Buchanan reprimands).

[94]Plaintiffs' brief opposing summary judgment, at 13-14.

[95]*See, e.g.,* plaintiff's evidentiary submissions, Tabs 18-21 (Buchanan reprimands).

defendant had promulgated for such purposes.[96]  The form provided blanks for the supervisor to inform an employee of the grounds upon which the reprimand was based, and additional space for counseling comments.  There also was space for the employee to insert a written response.  An additional section detailed the actions that would be taken against the employee,  if the conduct for which the employee was reprimanded persisted.  No further action was taken against Buchanan in conjunction with any of the first three reprimands that she received, but she was terminated simultaneously with the issuance of the fourth.[97]

Keenum first reprimanded Buchanan on September 13, 1999, for failing to initial a Medical Administration Record ("MAR").[98]   The MAR documents all medications administered to residents.[99]  Each nurse is required to initial the MAR after distributing medication to a resident.[100] Buchanan admits that she failed to initial the MAR and, notably, that it is appropriate to reprimand an employee for failing to do so.[101]  Nonetheless, Buchanan argues that her discipline in this instance was unfair, because two other nurses, Linda Dunlap, a Caucasian female, and Linda Hamilton, an African American female, had made the same error, but were not disciplined.[102]

Buchanan was reprimanded a second time on October 11, 1999, by her supervisor (Linda Hamilton) and the facility administrator (Linda Withers at the time), for scheduling an inadequate number of staff members to cover a shift.[103]  Buchanan asserts that she was unfairly blamed for

---

[96]*Id.*

[97]*Id.* at Tab 21 (Buchanan reprimand #4).

[98]Plaintiffs' evidentiary submissions, Tab 18 (Buchanan reprimand #1).

[99]*Id.*

[100]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 240.

[101]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 99-100.

[102]*Id.* at 99-101.  Defendant's brief in support of summary judgment, at 24.

[103]Plaintiffs' evidentiary submissions, Tab 19 (Buchanan reprimand #2).

scheduling errors by co-workers.[104]   Buchanan received her third reprimand on the same day,

October 11, 1999, for failing to follow her supervisor's instructions.[105]   Buchanan had recommended

significant changes in resident care without first consulting her supervisor and interdisciplinary care

team, in violation of defendant's policy.[106]   Buchanan contested the veracity of the charges leveled

against her, claiming that the allegations written on the "disciplinary action" form were "unfair &

untrue."[107]   Buchanan complained to Keenum and Withers within a few days of receiving the two

October 11, 1999 reprimands, and demanded an investigation.[108]

On December 1, 1999, Buchanan posted a memorandum without prior authorization from

the facility administrator, for which she received her fourth reprimand, and, was terminated.[109]

Mattie Banks was serving as facility administrator at the time; she had been appointed to that

position the previous month.[110]   According to defendant's policies, the facility administrator had to

approve the posting of any memoranda.[111]   The memorandum that Buchanan posted stated:

> ATTN ALL NURSING DEPT.
> THERE HAS [sic] BEEN MANY CHANGES TO THE SCHEDULE.
>
> IT IS OUT OF MY CONTROL, WE WILL BE STAFFED BASED ON OUR CENSUS.
>
> PART TIME EMPLOYEES WILL BE ON A, ON CALL STATUS.  IF YOU CAN'T
> WORK A WHOLE SHIFT, OR A 4-2 SCHEDULE YOU ARE PART TIME.
>
> BRENDA BUCHANAN[112]

---

[104]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 102-04.

[105]Plaintiffs' evidentiary submissions, Tab 20 (Buchanan reprimand #3).

[106]*Id.*

[107]*Id.*

[108]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 102-04..

[109]Plaintiffs' evidentiary submissions, Tab 21 (Buchanan reprimand #4).

[110]Defendant's evidentiary submissions, Exhibit 1 (Banks declaration) ¶ 1.

[111]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 259.

[112]Plaintiffs' evidentiary submissions, Tab 21 (Buchanan reprimand #4).

Buchanan says that Keenum directed her to post the memorandum,[113] but defendant contends that Keenum did not have the authority to authorize such a posting — that only facility administrator Banks had such authority.[114] Banks admitted that the posting contained no false information,[115] but stated in the written reprimand she issued to Buchanan that the posting "created anxiety among the nursing staff."[116]

After Banks learned of the unauthorized memo, she decided to investigate whether staffing was being properly conducted at Tut Fann.[117] She went to the staff development office (Buchanan's office) to ascertain how many new applications were being processed, and discovered a "stack" of applications waiting to be processed on Buchanan's desk.[118] Banks then walked through the facility and counted the nurses on duty.[119] While conducting her count, Tania Patterson, a CNA, approached Banks in the hall and told her that Buchanan had encouraged her to apply for employment at Windsor House, another local nursing home.[120] Buchanan admits that she told several Tut Fann employees to apply at Windsor House.[121] Buchanan contends that she only told a couple of employees to do so, and then only after they complained that they were not working enough hours at Tut Fann.[122] Banks testified, on the other hand, that Tut Fann was understaffed and in need of nurses at this time.[123] Banks stated that she felt that it "was malicious and hateful for

---

[113]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 118.

[114]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 259.

[115]*Id.* at 260-61.

[116]Plaintiffs' evidentiary submissions, Tab 21 (Buchanan reprimand #4).

[117]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 254-55.

[118]*Id.* at 254-55.

[119]*Id.* at 255-56.

[120]*Id.* at 256-57.

[121]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 119.

[122]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 119.

[123]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 256-59.

[Buchanan] to divert [Tut Fann] employees across town."[124]

Ultimately, Banks decided to terminate Buchanan, based upon her unauthorized posting of the memorandum, and, Buchanan's encouragement of fellow employees to seek employment at another nursing home.[125]  Significantly, Banks then had no knowledge of the three reprimands previously issued to Buchanan.[126]  Banks also was not aware that Buchanan was involved in an interracial relationship.[127]

## II. DISCUSSION

### A.    Aundrea McCrary's Claims

McCrary is not challenging defendant's initial failure to hire her, immediately after defendant's assumption of control over the Tut Fann nursing home in April and May of 1999; rather, she contests defendant's failure to hire her during the period between June and November of 1999.[128] McCrary claims that she was not hired because of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*, as well as 42 U.S.C. § 1981.

### 1.    McCrary's Title VII claim

McCrary must satisfy a number of administrative prerequisites in order to maintain her Title VII claim.  Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be

---

[124]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 270-71.

[125]*Id.* at 259, 268.

[126]*Id.* at 236.

[127]*Id.* at 237.

[128]Plaintiffs' brief in opposition to summary judgment, at 18.

brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."). "Timely filing is a prerequisite to the maintenance of a Title VII action." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n.4, 97 S. Ct. 1885, 1887 n.4, 52 L. Ed. 2d 571 (1977) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S. Ct. 1011, 1019, 39 L. Ed. 2d 147 (1974)).

If a plaintiff fails to file a charge within this 180 day period, her claim may be procedurally barred for untimeliness. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980); *Everett v. Cobb County School District*, 138 F.3d 1407, 1410 (11th Cir. 1998). This 180-day time limit begins to run when the complainant knows or reasonably should have known that a discriminatory act had occurred. *See, e.g., Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996) ("[T]he time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision.").

In October of 1999, McCrary telephoned the director of nursing at Tut Fann, Marisa Keenum, to ascertain the status of her second application.[129] McCrary explained to Keenum that, even though she had failed her April 1999 drug test, she had subsequently re-applied for employment with defendant, but had not yet been hired.[130] McCrary also told Keenum that she knew a white applicant who — like her — had failed the April 1999 drug test, but re-applied and had been hired.[131] McCrary questioned Keenum why she had not been hired as well.[132] McCrary testified that Keenum simply told her that "probably the reason why [McCrary] was not [hired] was because of [McCrary's] drug screen."[133]

---

[129]*Id.* at 164-66.

[130]*Id.*

[131]*Id.* at 166.

[132]*Id.*

[133]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 166.

The evidence, therefore, is clear that McCrary received unequivocal notice that she would not be re-hired when she spoke to Keenum on the telephone during October of 1999. McCrary even questioned Keenum on the issue of a similarly-situated Caucasian applicant who was hired, thus eliminating any doubt that McCrary was aware of the nature of her potential claim against defendant. Consequently, her 180-day time limit to file an EEOC charge began to run at that point. *See Grayson,* 79 F.3d at 1100 n.19. McCrary filed her EEOC charge on May 4, 2000, 185 days after October 31, 1999.[134] Thus, all of her Title VII claims are procedurally barred. *See Alexander v. Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000).

### 2.   McCrary's § 1981 claim

McCrary's § 1981 claim relies on precisely the same set of facts as her Title VII claim. Fortunately for McCrary, there are no administrative prerequisites to the maintenance of a § 1981 claim. Neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice as required by Title VII, nor "resort to Title VII's administrative machinery are . . . prerequisites for the institution of a § 1981 claim." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S. Ct. 1716, 1720, 44 L. Ed. 2d 295 (1975) (citation omitted). Even so, a plaintiff still must file suit within the applicable statute of limitations. Unlike Title VII, however, § 1981 does not contain an express statute of limitations. As a result, the Supreme Court instructs district courts to "select the most appropriate or analogous state statute of limitations" from the state in which the allegedly discriminatory act occurred. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660-61, 107 S. Ct. 2617, 2620, 2621, 96 L. Ed. 2d 572 (1987); *see also Wilson v. Garcia,* 471 U.S. 261, 266-68, 105 S. Ct. 1938, 1941-43, 85 L. Ed. 2d 254 (1985). In Alabama, that limitations

---

[134]Plaintiffs' evidentiary submissions, Tab 14 (McCrary EEOC charge).

period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (holding that § 1981 intentional discrimination claims arising out of acts occurring in Alabama are governed by Alabama Code § 6-2-38(l) (1975), the state's general, two-year limitations period applicable to personal injury actions); *see also Goodman*, 482 U.S. at 661-64, 107 S. Ct. at 2620-22 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims). Thus, McCrary's § 1981 claim is timely.

Section 1981 generally is described as "a parallel remedy against [racial] discrimination which may derive its legal principles from Title VII." *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).[135] "When section 1981 is used as a parallel basis for relief with . . . Title VII against disparate treatment in employment, its elements appear to be identical. . . ." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (citations omitted); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."). The court analyzes McCrary's § 1981 claim accordingly.

      a.      **Circumstantial evidence analysis of McCrary's claim**

When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L. Ed. 2d 668 (1973), and elaborated in *Texas Department of*

---

[135]In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

*Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106.

### i.    Prima facie case — discriminatory failure to hire

The elements of a prima facie case for discriminatory failure to hire a plaintiff who seeks a position that is filled by the employer after her rejection are:  (1) she is a member of a protected class; (2) she applied for, and was qualified to fill, a position for which the defendant was seeking applicants; (3) despite her qualifications, she was not hired; and (4) other equally or less qualified persons who were not members of her protected class were hired. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1104 (11th Cir. 2001); *Durley v. APAC, Inc.*, 236 F.3d 651, 656 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000); *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999); *see also, e.g., Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980) ("[P]laintiffs may establish a prima facie violation by showing that they are members of a group protected by [T]itle VII, that they sought and were qualified for positions that [the defendant-employer] was attempting to fill, that despite their qualifications they were rejected, and that after their rejection [the employer] either continued to attempt to fill the positions or in fact filled the positions [with persons outside the plaintiff's protected class].").

McCrary, as an African American female, is a member of a protected class and, thus, meets the first element of her prima facie case.  Further, she was not hired.  The remaining portions of

21

McCrary's prima facie case require closer analysis.  The second element requires that McCrary establish her qualifications for the job she sought.  Defendant argues that McCrary was not qualified to fill her desired job (LPN) because she was dishonest.[136]  LPNs must administer and keep track of medications, as well as perform certain medical procedures.[137]  Defendant's argument is based upon a common sensical proposition: that is, a person who substituted another person's urine for her own while taking a pre-employment drug test cannot be trusted to administer and account for medications dispensed to patients of a nursing home.[138]  McCrary's sole response is that, since Manley was hired after failing her initial drug test, defendant should be compelled to hire her as well.[139]  If McCrary and Manley were similarly-situated, this might be a plausible argument supporting McCrary's contention that she should have been hired, despite the fact that she failed the drug test.  However, McCrary and Manley are *not* similarly-situated, for a number of reasons.

Unlike McCrary, Manley explained her positive drug test by informing defendant that she had taken her mother's prescription medication, and tendering the prescription medicine for examination.  Manley's explanation corresponded to the drug detected in her urine.[140]  On the other hand, McCrary's fraudulently-submitted urine tested positive for marijuana.[141]  In contrast, defendant has only McCrary's word to divine what drug actually was present in her urine on the date of original testing.  Notably, defendant initially refused to hire Manley, but later decided to do so, based upon her former supervisor's strongly-written recommendation.[142]  McCrary had no such

---

[136]Brief in support of defendant's motion for summary judgment, at 15.

[137]*Id.*; Defendant's evidentiary submissions, Tab 5 (Sliger declaration) ¶ 12.

[138]Defendant states that "[h]onesty is a key qualification for the position of LPN."  Brief in support of defendant's motion for summary judgment, at 15.

[139]Plaintiffs' brief opposing summary judgment, at 18.

[140]*Id.* at 198-99.

[141]Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 114-15.

[142]Defendant's evidentiary submissions, Exhibit 4 (Owens declaration) ¶¶ 6 and 8.

endorsement.  Additionally, Manley presumably submitted her own urine at the drug test, and not someone else's, which arguably makes her transgression less severe — being one of omission instead of intentional falsification.  Finally, Manley applied for a completely different position than McCrary.  Manley applied for a position as a Certified Nursing Assistant, while McCrary applied for a position as an Licensed Practical Nurse.[143]  The record is undisputed that the job of Licensed Practical Nurse carries with it substantially greater responsibility than that of a Certified Nursing Assistant.[144]

In determining whether two individuals are similarly-situated, the "quality and quantity of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.")).  Here, McCrary and Manley's misconduct is not "nearly identical," nor are the positions that each sought.  For all of these reasons, it is clear that McCrary and Manley were *not* similarly-situated.  Consequently, Manley's hire does not undermine defendant's position that someone who committed the act that McCrary admitted is not qualified for the position of LPN.

McCrary also cannot meet the fourth element of a prima facie case:  namely, that other equally or less qualified persons who were not members of her protected class were hired.  During the disputed time period (June through November 1999), defendant hired twenty-seven LPNs.  Of these, fourteen, or approximately 52%, were African American, and thirteen, or approximately 48%,

---

[143]Defendant's evidentiary submissions, Exhibit 5 (Sliger declaration) ¶ 12.
[144]*Id.*

were Caucasian. Of the thirteen LPNs hired outside her protected class, McCrary has produced no evidence that any of them falsified or failed their drug test, or were in some other way unqualified to be employed as an LPN, but were hired nonetheless.

### b.    Direct evidence analysis of McCrary's claim

McCrary insists, nevertheless, that there is direct evidence of defendant's discriminatory animus: specifically, a string of comments made by Marisa Keenum, one of the staff members responsible for hiring LPNs. As director of nursing, Keenum ordinarily was one of the three persons who determined the hiring of LPNs. The other two decisionmakers were the staff development nurse and the facility administrator. McCrary alleges that the following comments constitute direct evidence of Keenum's discriminatory animus.[145]

> (1)    Buchanan states that "[Keenum] told me to start hiring some white people so we could get some intelligence in the building, because the intelligent [sic] level in the building was very low and the majority of all of our employees were black."[146]

---

[145]McCrary also states that she *heard a rumor* from Buchanan that Keenum threw her application in the trash. Plaintiffs' evidentiary submissions, Tab 1 (McCrary deposition), at 170. Buchanan did not address that rumor during her own deposition. Needless to say, such an unsubstantiated rumor does not constitute evidence that is properly considered when adjudicating a summary judgment motion. *See Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1337 (N.D. Ga. 2001) ("Rumors are, of course, not admissible toward proving a Title VII [or analogously, § 1981] claim"). "In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in admissible form." *Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (citing *Prichard v. Southern Company Services,* 92 F.3d 1130, 1135 (11th Cir. 1996)). The Eleventh Circuit explained the standard of "evidence that may be reduced to admissible form at trial" in *Macuba v. Deboer,* 193 F.3d 1316 (11th Cir. 1999), saying:

> We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.* at 1323-24 (footnotes omitted). Here, plaintiff's testimony as to "rumors" that Keenum threw her application in the trash is not admissible and, thus, is not properly considered for the purposes of summary judgment.

[146]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 68.

(2)     Keenum demanded that Buchanan show her photographs of applicants.[147]

(3)     Keenum asked Buchanan whether African Americans were "the only kind of [people] that ever [come] in here and [apply] for a job[.]"[148]

(4)     Buchanan overheard Keenum state that "if she had Cynthia Jones [an African American employee] out on her property, she'd show her black ass what an ass beating was all about.[149]

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-*

---

[147]*Id.* at 72-74.  Plaintiffs' brief also alleges that Keenum would throw the applications of African Americans in the trash, but Plaintiffs' citation to the record does not reveal any such thing.  Plaintiffs' brief in opposition to summary judgment, at 4.

[148]*Id.* at 73.

[149]*Id.* at 72.

*Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). As such, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (per curiam).

Eleventh Circuit precedent clearly establishes that only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible characteristic, will be deemed to constitute direct evidence of discrimination. *See, e.g., Damon*, 196 F.3d at 1358-59; *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990); *Carter*, 870 F.2d at 582. "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (citing *Burrell*, 125 F.3d at 1393). "An example of 'direct evidence would be a management memorandum saying, 'Fire Earley — he is too old.'" *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).

Two additional points must be emphasized. First, "stray remarks in the workplace . . . cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring).

Second, "statements made by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself," do not constitute direct evidence of discriminatory intent. *Id.*; *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (same). "For statements of discriminatory intent to constitute direct evidence of discrimination, *they must be made by a person involved in the challenged decision*." *Trotter v. Board of Trustees of the University of*

*Alabama*, 91 F.3d 1449, 1453-54 (11th Cir. 1996) (emphasis supplied); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998) ("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.") (citing *Mauter v. The Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987)); *Eiland v. Trinity Hospital*, 150 F.3d 747, 751-52 (7th Cir. 1998) (rejecting plaintiff's attempts at imputing racial animus of co-worker to decisionmaker).

In summary, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

The court finds that the first three comments attributed to Keenum that are listed above *were* related to the employment decision-making process. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.").  However, only the first comment clearly indicates an intent to discriminate on the basis of an applicant's race, without requiring an inferential leap. *See Damon*, 196 F.3d at 1358-59; *see also Carter*, 132 F.3d at 642.

The determinative inquiry on this issue, however, is whether Keenum was a decisionmaker with respect to McCrary's second application for employment.

> A "decisionmaker" is broadly defined as "a person involved in the challenged decision." *Trotter v. Board of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir. 1996). However, the mere fact that a management employee reviewed and evaluated the challenged decision and supplied information (favorable or unfavorable) to the final decisionmaker does not elevate that employee to decisionmaker status absent evidence that the employee had authority to overrule the final decision. *See Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1356 (11th Cir. 1999). At a minimum, to be deemed a decisionmaker, evidence must show that the employee made a

recommendation concerning the challenged employment action, such as members of a hiring committee or promotion panel. *Id.; see also Bass v. Board of Commissioners*, 242 F.3d 996, 1005 (11th Cir. 2001) ("Only statements by the persons involved in the decisionmaking process, here the interview panel members, could constitute direct evidence of discrimination").

*Chambers*, 132 F. Supp. 2d at 1364. Here, the evidence reflects that Keenum did not possess the authority to hire McCrary: further, there is no evidence — other than inadmissible hearsay[150] — that Keenum influenced defendant's decision to reject her second application for employment.

At deposition, Mattie Banks — who served as facility administrator at Tut Fann from November 1999 to January 2000, and was also defendant's 30(b)(6) designee — testified that the following was the general procedure by which applicants who had failed a pre-employment drug screening might still be considered for hire, depending upon whether a satisfactory explanation was given for the applicant's failure to test "clean":

> Q:   My question was: If someone failed the pre-employment drug screening, I thought I understood earlier you telling me they are not eligible to be hired?
>
> A:   They might not be offered a position if they fail a drug screen.
>
> Q:   Are you telling me that there are circumstances in which someone who fails a pre-employment drug screening does get hired at that time?
>
> A:   They would be offered an opportunity to provide additional information to explain the drug screen, and they still might not be hired. But *if they provided information that supported why that drug screen tests that way*, then they would be considered for hire.
>
> . . .
>
> Q:   Do I understand your testimony to be that if a pre-employment drug screen, if an applicant fails a pre-employment drug screen, it is within the discretion of the department head and the administrator whether or not that person gets hired?

---

[150]*See supra* note 145.

> A:   More to the discretion of the administrator because the administrator is held responsible for that position to hire or not.[151]

This process, and the specific circumstances surrounding defendant's failure to hire McCrary, is further elucidated in the declaration of Cathy Sliger, Keenum's predecessor as director of nursing at Tut Fann, who testified that both McCrary and her putative Caucasian comparator, Kelly Manley, were barred from re-employment by corporate headquarters following their initial failure of the pre-employment drug screening:

> Aundrea McCrary requested that she be allowed to take another drug test because the urine sample that she had initially submitted was not her own. I consulted with USA Healthcare's corporate office, although I do not remember with whom I spoke, and was told that USA Healthcare would not hire Aundrea McCrary because she had lied once and might lie again. I was not otherwise involved in the corporate office's decision not to hire Aundrea McCrary.
>
> . . .
>
> With respect to Kelly Manley, the corporate office gave the authority to make the hiring decision to me and Tut Fann's administrator [at that time], Tony Dahlberg. Tony and I decided to hire Kelly Manley.[152]

Thus, the record reflects that the decision to reject McCrary's second application for employment was made by defendant's corporate headquarters. In essence, McCrary placed herself beyond the scope of the hiring authority vested in Keenum and the facility administrator. There is no evidence to the contrary.

## B.   Brenda Buchanan's Claims

Buchanan claims that she was subjected to a racially-hostile work environment, discriminatory discipline and discharge, and retaliation, all in violation of in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981.

---

[151]Plaintiff's evidentiary submissions, Tab 3 (Banks deposition), at 94-98 (emphasis supplied).

[152]Defendant's evidentiary submissions, Exhibit 5 (Sliger declaration) ¶¶ 6 and 11.

### 1.    Racially-hostile work environment

Buchanan's racially-hostile work environment claim is based upon the offensive comments listed in § I(B)(1) *supra*. The first issue that must be addressed is whether Buchanan, a Caucasian female, possesses standing to assert such a claim based upon comments disparaging African Americans.

### a.    Standing

Buchanan bases her standing upon "her right to associate with African-Americans and her right to work in an environment free from race discrimination."[153] In response, defendant cites cases from other jurisdictions, holding that a plaintiff in Buchanan's position does not have standing to bring suit based upon harassment directed toward others.[154] *See, e.g., Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998) (holding that a white female did not have standing to assert a Title VII hostile work environment claim based on discrimination against African Americans); *Childress v. City of Richmond*, 134 F.3d 1205, 1207 (4th Cir. 1998) (holding that white male police officers did not have standing under Title VII to bring an action for discrimination directed at African American and female police officers).   Binding authority within the Eleventh Circuit is to the contrary, however. *See Equal Employment Opportunity Commission v. Mississippi College*, 626 F.2d 477, 481-83 (5th Cir. 1980) (holding that a white plaintiff could file an EEOC charge asserting that her employer discriminated against African Americans on the basis of race in recruitment and hiring, and, "may charge a violation of her own personal right to work in an environment unaffected by racial discrimination"); *see also Rogers v. Equal Employment Opportunity Commission*, 454 F.2d 234, 239 (5th Cir. 1971) (Goldberg, J.) (opining that a Hispanic employee should be able to file a

---

[153]Plaintiffs' brief opposing summary judgment, at 43.

[154]Defendant's brief in support of summary judgment, at 27-31.

Title VII charge against her employer for discrimination that, although not directed at her, had the effect of creating "a working environment heavily charged with discrimination").[155] The former Fifth Circuit's holding in *Mississippi College* — that a Caucasian female employee could "charge a violation of her own personal right to work in an environment unaffected by racial discrimination," 626 F.2d at 483 — was influenced by the Supreme Court's decision in *Trafficante v. Metropolitan Life Ins. Co.* 409 U.S. 205, 210, 93 S. Ct. 364, 367, 34 L. Ed. 2d 415 (1972), holding that Caucasian tenants of an apartment complex possessed standing under the Fair Housing Act to complain of discrimination against African Americans, by alleging an injury in fact in the form of the white plaintiffs' "loss of important benefits from interracial associations." Id. at 210, 93 S. Ct. at 367; *see also Mississippi College,* 626 F.2d at 482; *Faulk v. Home Oil Co.,* 173 F.R.D. 311, 312 (M.D. Ala. 1997) (holding that white employees could maintain a Title VII claim asserting that they "were denied a work environment free of racial discrimination and were denied the benefits of interracial association"). Accordingly, this court holds that Buchanan possesses standing to assert her hostile work environment claim.

### b.    Elements of a racially-hostile work environment claim

The elements of Buchanan's hostile work environment claim are the same, regardless of whether it is viewed through the lens of Title VII or § 1981. The Eleventh Circuit construes § 1981, as amended by the Civil Rights Act of 1991, as encompassing claims for a racially hostile work environment. *See Jackson v. Motel 6 Multipurpose, Inc.* 130 F.3d 999, 1008 n. 17 (11th Cir. 1997) (citing *Vance v. Southern Bell Telephone & Telegraph Co.,* 983 F.2d 1573, 1575 (11th Cir. 1993)

---

[155] Judge Goldberg wrote only for himself on this issue. Judge Godbold concurred on a different ground ("Mrs. Chavez's charge could be considered as describing discrimination practiced against her in that she, because of her ethnic status as a Spanish surnamed American, was permitted or required by her employers to attend or to have contact with only segregated patients"), and Judge Roney dissented. *See Rogers v. Equal Employment Opportunity Commission,* 454 F.2d 234, 241-45 (5th Cir. 1971).

(observing that the 1991 Act enlarged the scope of § 1981 to include post-hiring discrimination)); *see also Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (holding that § 1981, as amended, covers "general conditions of employment, including incidents of racial discrimination in the workplace"); *Johnson v. Uncle Ben's Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992) ("Under § 1981 as amended by the [1991 Civil Rights] Act, racial discrimination and other discrimination in an employment relation occurring after contract formation is actionable."); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1186 (N.D. Ala. 1999). Further, the elements of such a claim are the same under either statute. *See Vance*, 863 F.2d at 1509 n.3 ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of University System*, 697 F.2d 928, 935 n. 6 (11th Cir. 1983)); *see also Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

The elements of a prima facie case for a racially hostile work environment are:  (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment complained of affected was sufficiently severe or pervasive as to alter the terms and condition of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment either directly or vicariously. *See, e.g., Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002); *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994). *Cf. Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment). Defendant argues that Buchanan cannot satisfy the fourth element. The court additionally questions whether all of the comments of which Buchanan complains were based upon

race.

Here, Buchanan complains of fifteen sets of comments which, she alleges, in the aggregate, created a racially-hostile work environment. (The incidents are detailed in § I(B)(1) *supra*, and will be identified by their number in that section for ease of reference.) Buchanan suggests that the following statements, although not explicitly racist, nonetheless constitute racially-offensive statements:

> (1)    Keenum telling an African American employee that "I am sick and tired of seeing you people behind this desk all the time."
>
> . . .
>
> (11)    African American employees Veda McRoy and Martin Green both stated that Mattie Banks told African American employees at a staff meeting, "if you all don't like what I'm saying then you can go start flipping patties at the local fast food place." Buchanan was the only Caucasian employee present at the staff meeting.

Courts have repeatedly held that the utterance, "you people," or some variant thereof, even when directed at African American employees, is not "inherently racially offensive . . . without greater specificity as to the content of [its] usage." *Woodcock v. Montefiore Medical Center*, 2002 WL 403601, *3 (E.D. N.Y. 2002) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)); *see also Lawton v. Sunoco, Inc.*, 2002 WL 1635190, *5 (E.D. Pa. 2002) (holding that use of the phrase "you people" when addressing employees did not evidence racial discrimination against blacks); *Miller v. CCC Information Systems, Inc.*, 1996 WL 480370, *5 (N.D. Ill. 1996) (holding that employer's walking through a room full of black employees and saying, "you people need to be in a zoo," failed to show racial harassment, because the statement was not sufficiently connected with race). Statements (1) and (11) are ambiguous and, thus, not properly considered as racially-discriminatory.

33

Returning to the hostile work environment analysis proper, the fourth element necessary to state a prima facie case is that the harassment be sufficiently severe or pervasive as to affect the employees's terms or conditions of employment. Further, "the harassment must be both subjectively and objectively offensive — the plaintiff must show both that a reasonable person would find the environment 'hostile or abusive' and that she actually did find the environment to be offensive." *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1187 (N.D. Ala. 1999) (quoting *Harris v. Forklift Sytems, Inc.*, U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

When evaluating whether conduct is sufficiently severe or pervasive to assert a hostile work environment claim, the court must examine the totality of the circumstances, including such factors as the following: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating; and (4) whether the conduct unreasonably interferes with the plaintiff's work performance. *See, e.g., Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995).

The court first inquires as to the frequency of the conduct. All of the complained-of conduct occurred during an approximate seven month period, between May and December of 1999. Viewing the facts in a light most favorable to Buchanan, the court holds that the racial comments were made frequently.

Similarly, Comstock's frequent use of the racial slur "nigger" unquestionably was severe. Mitigating against the severity of such comments in this context, however, are these facts: (1) Keenum and Comstock were not aware that Buchanan dated an African American until "late

summer of 1999,"[156] at the earliest, and thus had little reason to know of Buchanan's heightened sensitivity to such language; (2) Comstock worked in a different department (maintenance) than Buchanan (staff development nurse); and (3) none of the racial slurs were specifically directed at Buchanan or her boyfriend.  What is much more clear is that Buchanan cannot show that the comments were physically intimidating or humiliating, and not merely offensive utterances.  None of the complained-of statements, except for Keenum's statement that she was surprised that Buchanan would date an African American, were directed toward Buchanan or her interracial association.  Such a general statement of surprise cannot be reasonably cast as physically intimidating or humiliating.  Buchanan's interracial relationship was never disparaged, and she has shown no evidence that she was perceptibly denied the opportunity to associate with African Americans. *See Harris,* 510 U.S. at 23, 114 S. Ct. at 371, 126 L. Ed. 2d at 295; *Edwards,* 49 F.3d at 1521-22.  Consequently, this court finds that these statements were neither objectively humiliating, nor physically intimidating.

Further, Buchanan has presented no evidence indicating that the alleged conduct interfered in any way with her work performance.  Buchanan states that Keenum was upset when she (Buchanan) hired Angela Sims; Keenum allegedly stated that she did not want any more African Americans in management positions.  In fact, however, the evidence shows that a majority of the people hired by defendant during the time in question were African American.[157]  Keenum's offhand comments, while offensive, did not operate to unreasonably interfere with Buchanan's job performance.  Further, the statements by Comstock cannot reasonably be interpreted to have

---

[156]The court did not find such a reference in Buchanan's deposition, but Buchanan's counsel makes this assertion in its brief, and it appears to be unopposed by any evidence, so the court will refer to plaintiffs' brief for this fact.  Plaintiffs' brief opposing summary judgment, at 8.

[157]Defendant's brief supporting summary judgment, at 16.

unreasonably interfered with Buchanan's job performance, because Comstock worked in a different department.

Accordingly, this court holds that Buchanan has failed to produce adequate evidence to show that the complained-of conduct was sufficiently severe or pervasive to affect a term or condition of her employment, and summary judgment is due to be granted on her hostile work environment claim.

### 2.    Racially-discriminatory discipline and termination

Buchanan contends that defendant subjected her to disparate treatment when it reprimanded, and ultimately discharged her, because of her association with African Americans. There is no direct evidence that defendant purposely treated Buchanan worse than other employees regarding her discipline and discharge. Thus, Buchanan must rely on circumstantial evidence to press her claims.

### a.    Buchanan's termination

To set forth a prima facie case for disparate treatment termination, Buchanan must show that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was terminated; and (4) a similarly-situated person not in her protected class was treated differently. *See, e.g., Hall v. Lowder Realty Co., Inc.,* 160 F. Supp. 2d 1299, 1325 (M.D. Ala. 2001) (citing *United States v. Crosby,* 59 F.3d 1133, 1135 (11th Cir. 1995)). Buchanan clearly cannot present a prima facie case, because she has made no attempt to identify a similarly-situated person. Rather, Buchanan attempts to dispense with this problem by asserting that "[d]efendant attempts to use the *McDonnell Douglas-Burdine* framework as a sword by asserting that plaintiff cannot meet her prima facie case."[158]

---

[158]Plaintiffs' brief opposing summary judgment, at 51.

While it is true that the "ultimate question" in every employment discrimination case is *not* whether a contested employment action was good or bad, fair or unfair, or whether the plaintiff has established a prima facie case, or demonstrated pretext, but instead is whether "'the defendant intentionally discriminated against the plaintiff,'" *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1481-82, 75 L. Ed. 2d 403 (1983) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981)), Buchanan must nonetheless set forth evidence that her discharge was based upon some impermissible consideration.

Here, the evidence shows that Banks fired Buchanan for two reasons:  posting an unauthorized memorandum; and advising co-workers that they should seek employment at a competing nursing home.[159]  Banks had no prior notice of Buchanan's earlier reprimands, nor was she aware that Buchanan dated an African American.[160]  Buchanan has offered no evidence to the contrary.  Accordingly, Buchanan's claim of discriminatory termination is due to be dismissed for the simple reason that Buchanan has set forth no evidence which could causally link her termination to an impermissible consideration.  *See Silvera v. Orange County School Board*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and presumed intent.").

### b.    Buchanan's discipline

Buchanan asserts that she was unfairly "disciplined" by defendant because of her association with African Americans.  Buchanan was reprimanded on four occasions prior to her termination:

(1)    September 13, 1999 form signed by Keenum for failure to initial the Medical

---

[159]Defendant's evidentiary submissions, Exhibit 1 (Banks declaration) ¶ 3.

[160]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 236-37.

Administration Record ("MAR").  Buchanan also signed the reprimand.[161]

(2)     October 11, 1999 form signed by Hamilton (supervisor) and Withers (facility administrator) for failure to follow her supervisor's instructions regarding scheduling staff to cover a shift.  Buchanan also signed the reprimand.[162]

(3)     October 11, 1999 form signed by Keenum and Withers for failure to follow a known policy or procedure.   The disciplinary statement charged Buchanan with recommending a patient's therapy be changed without going through the proper administrative channels.  Buchanan also signed the reprimand, but wrote that "I did not mention placebo to Dr. Possard, Nadine Owens did, this is unfair & untrue."[163]

(4)     December 1, 1999 form signed by Keenum, Hamilton, and Banks (then serving as facility administrator) for posting a notice without permission.  Buchanan refused to sign the reprimand.[164]

There is no direct evidence that any of the foregoing reprimands were based upon Buchanan's association with African Americans.  Accordingly, she must prove her case via the *McDonnell Douglas* framework.

Buchanan must first establish a prima facie case demonstrating discriminatory discipline for violation of work rules by showing that: (1) she belongs to a protected class under Title VII; and (2) that she did not violate the work rule, or that she engaged in misconduct similar to that of a person outside her protected class, and that the disciplinary measures enforced against her were more severe than those enforced against other employees who engaged in similar misconduct.  *See, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989).

The first element requires membership in a protected class.  Buchanan posits that she was discriminatorily disciplined because Keenum found out that she was involved in an interracial

---

[161]Plaintiffs' evidentiary submissions, Tab 18 (Buchanan reprimand #1).

[162]Plaintiffs' evidentiary submissions, Tab 19 (Buchanan reprimand #2).

[163]Plaintiffs' evidentiary submissions, Tab 20 (Buchanan reprimand #3).

[164]Plaintiffs' evidentiary submissions, Tab 21 (Buchanan reprimand #4).

relationship, and disapproved of the same.[165]  As a Caucasian woman dating a African American man, Buchanan is a member of a protected class under Title VII. *See Parr v. Woodmen of the World Life Insurance Co.,* 791 F.2d 888, 892 (11th Cir. 1986) (holding that Title VII proscribes all racially-discriminatory practices, and that a claim of discrimination based on an interracial association is, by definition, racially-based discrimination).

The second element, however, requires closer scrutiny.  Here, the first three reprimands that Buchanan received were labeled as "disciplinary action[s]"; in fact, however, Buchanan suffered no adverse consequences beyond the mere receipt of a written rebuke.  Indeed, the evidence shows that there is no connection between Buchanan's first three reprimands and her later termination.  Rather, as previously discussed, Buchanan was terminated by Mattie Banks, who had no prior knowledge of the first three reprimands.

Moreover, implicit in the second element of the prima facie case is the requirement that the disciplinary measures taken against a plaintiff must rise to some level of substantiability before they can form the basis of a Title VII claim.  Otherwise, the courts would be forced to conduct trials over trivial and insignificant incidents in which the plaintiff suffered no calculable damages.  The question that thus presents itself is whether the first three reprimands, for which Buchanan suffered no tangible consequences beyond the reprimand itself, are sufficiently severe that they can form the basis of a Title VII claim, should they ultimately be found to have been wrongfully issued.  This court holds that they cannot.

In order to make out a case of discriminatory discipline under Title VII, Buchanan must show that she has suffered an adverse employment action. *See Hudson v. Norfolk Southern Railway*

---

[165]Plaintiffs' brief opposing summary judgment, at 54.

*Co.*, 209 F. Supp. 2d 1301, 1334 (N.D. Ga. 2001).  An adverse employment action is "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Id.* (citing *Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir. 2000)).  "Although adverse employment actions may include reprimands . . . the action in question must have more than a tangential effect on the ultimate employment decision . . . . Indeed, the conduct in question must rise to a substantial level before it can be cognizable as unlawful discrimination." *Hanley v. Sports Authority,* 143 F. Supp. 2d 1351, 1356 (S.D. Fla. 2000) (discussing a racially-disparate treatment claim) (citing *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998); *Mattern v. Eastman Kodak,* 104 F.3d 702, 708 (5th Cir. 1997); *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir. 1994)); *see Grube v. Lau Industries, Inc.,* 257 F.3d 723, 729 (7th Cir. 2001) (holding that unfair reprimands or negative performance evaluations of employee, unaccompanied by some tangible job consequence, do not constitute adverse employment actions); *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001) (holding that, even though "each oral or written reprimand brought [plaintiff] closer to termination," they still did not form an independent basis for liability under Title VII because, "absent some tangible job consequence accompanying the reprimands, we decline to broaden the definition of adverse employment action to include them (quotations omitted)").  Here, Buchanan has not pointed to any immediate consequence related to the first three reprimands that she received, and thus they cannot reasonably be construed as an adverse employment action. Consequently, Buchanan's first three reprimands do not rise to a level of substantiability such that they can form the basis of a Title VII claim.

The fourth reprimand, dated December 1, 1999, in which Buchanan was reprimanded for posting an unauthorized memorandum, and which formed part of the basis for her termination must be considered separately from the first three. Buchanan cannot establish a prima facie case of discriminatory discipline with respect to this reprimand because she has not identified anyone outside her protected class who committed a similar offense and received a less severe punishment.

Buchanan asserts that she nonetheless has a valid claim, because it is "the existence of a genuine issue of material fact, not existence or nonexistence of a prima facie case," that determines whether summary judgment should be granted. *Thornbrough v. Columbus and Greenville R. Co.*, 760 F.2d 633, 641 n. 8 (5th Cir. 1985).[166] The court agrees with the general correctness of this proposition, adding that "the factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff." *Aikens*, 460 U.S. at 715, 103 S. Ct. at 1482.

The evidence is uncontroverted that Banks disciplined Buchanan on December 1, 1999, and, further, that Banks had no knowledge of Buchanan's interracial relationship or previous infractions.[167] Buchanan has produced no evidence that the reprimand she received on December 1, 1999, was motivated by discriminatory animus in some other way. Accordingly, her claim of discriminatory discipline based upon the December 1, 1999 reprimand must fail. *See Walker v. Prudential Property and Casualty Insurance Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("When evaluating a charge of employment discrimination . . . we must focus on the actual knowledge of the decision-maker."); *Silvera v. Orange County School Board.*, 244 F.3d 1253, 1262 (11th Cir. 2001) (holding that "[d]iscrimination is about actual knowledge, and real intent, not constructive

---

[166]Plaintiff' brief opposing summary judgment, at 51.

[167]Plaintiffs' evidentiary submissions, Tab 3 (Banks deposition), at 236-37. Buchanan asserts that Keenum told her that Banks was aware of her disciplinary actions before Buchanan's termination, but this statement is not based upon Buchanan's personal knowledge, and hence constitutes hearsay, which is not properly considered in evaluating this summary judgment motion. Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 109.

knowledge and assumed intent."); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). The court briefly adds that mere temporal proximity between the three earlier-issued reprimands and the fourth reprimand is not sufficient to permit Buchanan to survive summary judgment where Buchanan has produced no evidence that Banks was aware of these earlier events. *See id.* (holding that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.") (citing *Clover v. Total Systems Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)). Buchanan's discriminatorily disparate discipline is therefore due to be dismissed.

### 3.    Retaliation

Buchanan states that she complained of race discrimination while employed by defendant, and that she was retaliated against as a result.

Generally speaking, a plaintiff must prove three elements to establish a prima facie case of retaliation: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Once a plaintiff makes out a prima facie

case of retaliation,

> the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.

*Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999) (quoting *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir.1997)) (citation omitted).

Buchanan lodged a written complaint with then-facility administrator Linda Withers, explaining in her deposition that "I wanted investigations to be done on the fact that I was getting write-ups for things that I did not do."[168] Buchanan does not set forth the exact date that she submitted this complaint to Withers, but it is apparent from the context of the complaint that it was within a few days after October 12, 1999.[169] Buchanan's subsequent termination undoubtedly was an adverse employment action. However, Buchanan cannot show that the adverse employment action taken against her was causally related to her request for an investigation, even assuming that act was protected activity.

Buchanan was terminated by Banks on December 1, 1999; and, as previously discussed, the evidence clearly shows that Banks had no prior knowledge of Buchanan's interracial relationship, Buchanan's complaint, or any of the three prior reprimands that Buchanan had received. Buchanan has offered no evidence to cast doubt on Banks' assertions. Without such a showing, Buchanan's retaliation claim must fail. *See Brungart,* 231 F.3d at 799 ("A decision maker cannot have been motivated to retaliate by something unknown to him").

---

[168]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 61.

[169]*Id.* at 102-04.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted as to all of plaintiffs' claims. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this ___15th___ day of November, 2002.

United States District Judge

44