UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
03 MAR 17 PM 2:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

| | |
|---|---|
| AUNDREA McCRARY and BRENDA BUCHANAN, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Civil Action No. CV-01-S-0262-NE ) |
| USA HEALTHCARE - VA, LLC, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This court entered summary judgment in favor of defendant on all claims of both plaintiffs on November 15, 2002.[1] Plaintiff Brenda Buchanan subsequently filed a motion to reconsider summary judgment as to her racially-hostile work-environment claim.[2] The motion was granted, and the parties were ordered to submit briefs.[3] The court now undertakes to reconsider that portion of its prior decision.

## I. HOSTILE WORK ENVIRONMENT

### A.   Factual Basis

The facts pertinent to this action were set out at length in the memorandum opinion entered on November 15, 2002.[4] The following statements accordingly address only those events relevant to the present issue.

Brenda Buchanan asserts a racially-hostile work-environment claim based upon a series of comments which disparaged African Americans, not persons like herself, a Caucasian female. All

---

[1] *See* doc. nos. 62 and 63.
[2] *See* doc. no. 66, filed December 2, 2002.
[3] *See* doc. no. 67.
[4] *See* doc. no. 62.

but one of the derogatory statements identified by Buchanan were made by either Marisa Keenum, director of nursing at the Floyd E. "Tut" Fann State Veterans' Home, a nursing home facility managed by defendant, or Matt Comstock, a maintenance supervisor. Only one comment is attributed to Mattie Banks, the facility administrator. The following is a list of the offending comments:

(1)  Keenum instructed an African American Certified Nursing Assistant (CNA) named Carmen Miller to quit sitting at the nurse's desk and go to work, saying "I am sick and tired of seeing you people behind this desk all the time."[5] (As Buchanan explained in deposition: "Carmen said, what do you mean by you people. [Keenum] said you know exactly what I mean. You get out from behind that desk and you go down the hall and you find something to do. She did not say anything to the other CNA who was Caucasian [Ann Glassbyrd]."[6])

(2)  Keenum instructed Buchanan to hire Caucasian employees, "so we could get some intelligence in the building, because the intelligent [sic] level was very low and the majority of all of our employees were black."[7] Matt Comstock, a maintenance supervisor, made similar statements on numerous occasions.[8]

(3)  Keenum and Comstock told Buchanan that they wanted photographs of prospective employees submitted with all applications for employment.[9]

(4)  Keenum told Buchanan that, if African American co-employee Cynthia Jones were on Keenum's property, Keenum would show Jones's "black ass what an ass beating was all about."[10]

(5)  While discussing arrangements for the employee barbeque, Keenum stated "we had to have a lot of chicken and watermelon to satisfy all the black people working [at the Tut Fann Veteran's Home]."[11] Comstock then replied, "yeah, because niggers really like that kind of food."[12]

---

[5]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 67.
[6]*Id.*
[7]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 68.
[8]*Id.* at 78.
[9]*Id.* at 73, 94-95.
[10]*Id.* at 72.
[11]*Id.* at 75.
[12]*Id.* at 77-78.

(6) Comstock used the blatantly-racist epithet "nigger" on a regular basis, but most often during employee breaks.[13]

(7) Comstock asked Buchanan if the applicants for openings in the security department were black or white.[14]

(8) Comstock described an African American housekeeping employee (Bertha Ferrier) as "stupid and dumb."[15]

(9) During the summer of 1999, Keenum saw Buchanan get into an automobile driven by Michael Irvin (an African American) at the end of Buchanan's shift.[16] The following day Keenum asked Buchanan who the man was.[17] Buchanan replied that he was her boyfriend.[18] Keenum remarked that she was surprised Buchanan would date a black man.[19]

(10) African American employee Martin Green stated that Keenum treated black employees worse than white employees, and he heard Keenum comment: "from the town I was raised in, we would take them out in the field."[20]

(11) African American employees Veda McRoy and Martin Green both stated that Mattie Banks told African American employees during a staff meeting, "if you all don't like what I'm saying then you can go start flipping patties at the local fast food place."[21] Buchanan was the only Caucasian employee present at the staff meeting.[22]

(12) Green and McRoy both heard that an African American CNA overheard Keenum say "nigger" in the bathroom.[23]

(13) Green told Buchanan that Keenum said she was "tired of the black asses and their not doing anything."[24]

---

[13]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 78-79, 88.

[14]*Id.* at 93-94.

[15]*Id.* at 78.

[16]*Id.* at 69-70; Plaintiffs' brief opposing summary judgment, at 8

[17]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 69-70.

[18]*Id.*

[19]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 69-70.

[20]Plaintiffs' evidentiary submissions, Tab 28 (Green affidavit) ¶ 4.

[21]*Id.* at ¶ 6; Plaintiffs' evidentiary submissions, Tab 29 (McRoy declaration) ¶ 6.

[22]Plaintiffs' evidentiary submissions, Tab 28 (Green affidavit) ¶ 6.

[23]*Id.* at ¶ 7; Plaintiffs' evidentiary submissions, Tab 29 (McRoy declaration) ¶ 4.

[24]Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 65.

(14)   Green told Buchanan that Banks frequently referred to African American employees as "you people."[25]

(15)   After Buchanan hired Angela Sims, an African American, to work in the staffing department, Keenum told Buchanan that "she didn't want any more black management people on the team."

### B.     Relevance of Some of the Purportedly Discriminatory Statements

Buchanan complains that the fifteen sets of comments listed above, when considered in the aggregate, created a racially-hostile work-environment. Three of those comments require a closer examination: *i.e.*,

(1)    Keenum telling an African American employee that "I am sick and tired of seeing you people behind this desk all the time."

. . .

(11)   The testimony of African American employees Veda McRoy and Martin Green that Mattie Banks told African American employees during a staff meeting, "if you all don't like what I'm saying then you can go start flipping patties at the local fast food place."

. . .

(14)   Green's statement that Banks frequently referred to African American employees as "you people."

Statement (11) is ambiguous and, thus, not properly considered as manifesting a racial animus.

With regard to statements (1) and (14), courts have repeatedly held that the utterance, "you people," or some variant thereof, even when directed at African American employees, is not "inherently racially offensive . . . without greater specificity as to the content of [its] usage." *Woodcock v. Montefiore Medical Center*, 2002 WL 403601, *3 (E.D. N.Y. 2002) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)); *see also Lawton v. Sunoco, Inc.*, 2002 WL 1635190, *5 (E.D. Pa. 2002) (holding that use of the phrase "you people" when addressing

---

[25]*Id.*

-4-

employees did not evidence racial discrimination against blacks); *Miller v. CCC Information Systems, Inc.*, 1996 WL 480370, *5 (N.D. Ill. 1996) (holding that employer's walking through a room full of black employees and saying, "you people need to be in a zoo," failed to show racial harassment, because the statement was not sufficiently connected with race). Even so, when viewed in the context of all of the other incidents identified by Buchanan, the court finds that statements (1) and (14) are indicative of a racial bias on the part of Marisa Keenum and Matt Comstock, and particularly Comstock. That is not the end of the inquiry, however.

Statements (10) and (12), both of which were made in affidavits submitted by other employees of the Tut Fann Veterans Home (Martin Green and Veda McRoy), are not relevant to the analysis of Buchanan's hostile work environment claim, because there is no evidence that she was aware of the facts alleged in these statements until after her employment was terminated. Thus, those second-hand statements, which were related to her only later, cannot have contributed to her hostile work environment claim.

> Plaintiff may support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, *so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment. See Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999) (hostile work environment claimant may introduce evidence of offensive mens' room graffiti she learned about through hearsay during her employ, even though she had never been inside the men's room); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2nd Cir. 1997) (allowing use of eight hearsay incidents of racially offensive remarks made outside Plaintiff's presence to be considered in hostile work environment claim, because "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment").

*Hudson v. Norfolk Southern Railway Co.*, 209 F. Supp. 2d 1301, 1326-27 (N.D. Ga. 2001) (emphasis supplied); *see also Dixon v. Young*, No. 3:98-CV-167-JTC, 2000 WL 33224515, at *6 (N.D. Ga.

Sept. 21, 2000) ("An employee can hardly contend that his environment was racially hostile if he did not experience the alleged hostility.").

## C. Elements of a Racially-Hostile Work-environment Claim

The Eleventh Circuit has held that 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, now encompasses claims for a racially-hostile work-environment. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (citing *Vance v. Southern Bell Telephone & Telegraph Co.*, 983 F.2d 1573, 1575 (11th Cir. 1993) (observing that the 1991 Act enlarged the scope of § 1981 to include post-hiring discrimination)); *see also Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (holding that § 1981, as amended, covers "general conditions of employment, including incidents of racial discrimination in the workplace"); *Johnson v. Uncle Ben's Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992) ("Under § 1981 as amended by the [1991 Civil Rights] Act, racial discrimination and other discrimination in an employment relation occurring after contract formation is actionable."); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1186 (N.D. Ala. 1999) (applying Title VII analysis of a racially-hostile work-environment claim with equal force to the same claim brought pursuant to § 1981).

Further, the proof necessary to establish a § 1981 racially-hostile work-environment claim is the same as one asserted under Title VII. *See Vance*, 863 F.2d at 1509 n.3 ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of University System*, 697 F.2d 928, 935 n. 6 (11th Cir. 1983)); *see also Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

A plaintiff must demonstrate five elements to establish a prima facie racially-hostile work-

environment case: *i.e.*, (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment complained of was sufficiently severe or pervasive as to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is liable for the environment under a theory of either direct or vicarious liability. *See, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994). *Cf. Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment). This court previously determined that Buchanan could not satisfy the fourth element.[26] That determination is the subject of Buchanan's motion to reconsider.

The fourth element requires a plaintiff to demonstrate that the harassment was sufficiently severe or pervasive as to alter the terms or conditions of her employment, and that it created a discriminatorily abusive work enviornment. Further, "the harassment must be both subjectively and objectively offensive — the plaintiff must show both that a reasonable person would find the environment 'hostile or abusive' and that she actually did find the environment to be offensive." *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1187 (N.D. Ala. 1999) (quoting *Harris v. Forklift Sytems, Inc.*, U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

When evaluating whether conduct is sufficiently severe or pervasive as to survive a motion for summary judgment, courts examine the totality of circumstances, including such factors as: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating; and (4) whether the conduct unreasonably interferes with the plaintiff's work

---

[26] Summary judgment memorandum opinion (doc. no. 62), at 36.

performance. *See, e.g., Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).

The court begins its reanalysis of Buchanan's claim by observing that virtually all of the properly-considered comments she complains about were uttered during conversations by her with Comstock, or Keenum, or both persons. Buchanan was herself the subject of only one of the comments — Keenum's statement, made during the summer of 1999, that she was surprised Buchanan would date a black man.[27] Further, there is no evidence that Keenum or Comstock were aware that Buchanan was dating an African-American male when they made the remainder of the offending statements.[28] That fact weighs heavily against a finding of severity. *See Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff."); *Watson v. City of Topeka*, 2002 WL 31933781, at *4 (D. Kan. Dec. 27, 2002) (holding that a plaintiff asserting a hostile work environment claim "must produce evidence that he was the object of harassment"); *cf. Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (holding that "the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee 'does not rise to a Title VII violation,'" unless the harassment is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment") (quoting *Henson*, 682 F.2d at 904).

While this court accepts that Buchanan, as a Caucasian female dating an African-American male, found — and that a jury could conclude that a person in Buchanan's position reasonably would

---

[27] Keenum became aware that Buchanan was dating an African-American in "late summer of 1999." Plaintiffs' brief opposing summary judgment, at 8.

[28] *Id.*

-8-

find — the remarks of Keenum and Comstock to be patently offensive, she has made no showing that any of their statements were personally humiliating, much less physically threatening. *See Utomi v. Cook County*, No. 98 C 3722, 2001 WL 914465, at *4 (N.D. Ill. Aug. 14, 2001) (holding, when assessing the racial harassment claims of several African American hospital workers, that "[t]he word 'nigger' is certainly humiliating, but it does not by itself imply a threat of physical harm like, for example, the 'KKK' graffiti and hanging of black male effigies").

Buchanan also has made no showing that the racially-offensive statements of Keenum and Comstock adversely affected her work performance. While Buchanan does state that Keenum was "upset" when she hired Angela Sims, an African American, there is no evidence that Buchanan was prevented from hiring any other person, except co-plaintiff Aundrea McCrary, who appropriately was denied employment after submitting another person's urine, rather than her own, during a pre-employment drug screening.[29]

The evidence further indicates that a substantial number of the racially-offensive comments were uttered by Keenum and Comstock while they were taking "smoke breaks" on a patio outside the nursing home facility.[30] Despite Buchanan's professed aversion to these statements, she regularly took her own smoke breaks with these two individuals, and endured their comments without complaint until after she was disciplined by Keenum in September of 1999.[31] Indeed, Buchanan does not indicate that Comstock, who worked in a different department as a maintenance supervisor, uttered any racially-offensive statements outside the break area.[32] Thus, her exposure to his offensive

---

[29] Memorandum opinion (doc. no. 62), at 16-29.

[30] Plaintiffs' evidentiary submissions, Tab 2 (Buchanan deposition), at 72-73 and 76-77.

[31] *Id.*, Tab 2 (Buchanan deposition), at 62; Tab 18 (Buchanan Disciplinary Action form Sept. 13, 1999). Buchanan was hired on May 1, 1999. *Id.* at 72; Tab 26 (Buchanan EEOC Charge).

[32] *Id.*, Tab 2 (Buchanan deposition), at 88, 95.

comments was entirely voluntary. Such a situation reveals two factors key to reassessment of Buchanan's claim: the racial invective that she complains of was almost totally confined to banter during smoke breaks and, thus, did not pervade her work environment; and, Buchanan's voluntary interaction with Keenum and Comstock, combined with her lack of complaints about their comments until *after* she had been disciplined by Keenum, casts doubt upon the sincerity of Buchanan's assertion that she subjectively perceived her environment as racially hostile and abusive. *But see United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (in deciding whether the moving party has met its burden, the court may not weigh the evidence nor make credibility determinations; rather, "the evidence of the non-movant is to be believed") (quoting *Anderson Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)).

Even so, viewing the totality of the circumstances, the incidents that Buchanan complains of do not objectively demonstrate that she was subjected to a racially-hostile work-environment. While she has identified two employees who made disparaging remarks about African Americans, Buchanan's mere passive (and often voluntary) exposure to those offensive comments does not give rise to an actionable claim. The courts have held time and again that the federal civil rights statutes are not a general civility code, nor is every workplace tribulation properly remedied by a lawsuit. Buchanan's *post hoc* expression of disdain for the racist attitudes expressed by her co-workers toward African Americans is not an injury that warrants legal action.

## II. CONCLUSION

Upon review of that portion of the court's memorandum opinion that is the subject of Buchanan's motion to reconsider, this court reaches the same conclusion, albeit by a slightly

different rationale. Plaintiff's hostile work environment claim is due to be dismissed with prejudice.

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 17th day of March, 2002.

                                                                United States District Judge